United States Court of Appeals,

Eleventh Circuit.

Nos. 95-8896, 95-8921.

Bhupendra CHUDASAMA;  Gunvanti B. Chudasama, Plaintiffs-Appellees,

v.

MAZDA MOTOR CORPORATION;  Mazda Motor of America, Inc., Defendants-Appellants.

Sept. 15, 1997.

Appeals from the United States District Court for the Middle District of Georgia. (No. 4:93-CV-61-JRE), J. Robert Elliott, Judge.

REPRINTED OPINION

Before TJOFLAT and ANDERSON, Circuit Judges, and NANGLE[*], Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This case illustrates the mischief that results when a district court effectively abdicates its responsibility to manage a case involving contentious litigants and permits excessive and dilatory discovery tactics to run amok.  Not only did the district court fail to manage discovery in this case, it in effect delegated the duty to manage to the plaintiffs' counsel.  To protect themselves from the plaintiffs' inevitable overreaching, the defendants resorted to self-help and did not provide full discovery.  Their tactic resulted in draconian sanctions, including the entry of a default under Rules 26 and 37 of the Federal Rules of Civil Procedure.  Finding that the district court abused its discretion, we vacate the order imposing sanctions and direct that the case be assigned on remand to another district judge.

In part I of this opinion, we describe the discovery disputes below and the district court's management of the case.  In part II, we delineate the scope of our jurisdiction over these consolidated appeals.  We conclude, in part III, that the court's order was improper under Rule 37 and, in part IV, that the order was improper under Rule 26 as well.  Having decided that the order must be vacated, we explain in part V why the chief district judge must assign the case to another district judge on remand.

I.

On May 16, 1991, Bhupendra Chudasama and his wife, Gunvanti B., appellees, purchased a used 1989 Mazda MPV minivan (the "MPV minivan") from Jays Dodge City, a Columbus, Georgia Dodge dealer.  On the morning of October 15, 1991, Gunvanti Chudasama was injured when Bhupendra Chudasama lost control of the minivan and it collided with a utility pole.[1]  Mrs.

---

[*]Honorable John F. Nangle, Senior U.S. District Judge for the Eastern District of Missouri, sitting by designation.

[1]The Chudasamas' complaint states that, "[a]ccording to the police report, the vehicle was traveling, in the rain, 45 miles per hour in a 25 mile per hour zone."

Chudasama sustained a broken pelvis and broken facial bones; Mr. Chudasama was uninjured. Mrs. Chudasamas' medical bills totaled approximately $13,000, and she lost approximately $5,000 in wages. The accident left the MPV minivan, worth approximately $11,000, beyond repair.

On April 30, 1993, the Chudasamas filed a products liability action against the appellants—Mazda Motor Corp. ("Mazda Japan"), a Japanese company, and Mazda Motor of America, Inc. ("Mazda America"), an American subsidiary of Mazda Japan, (collectively "Mazda")—in the United States District Court for the Middle District of Georgia.[2] The complaint pointed to two alleged defects in the MPV minivan as the cause of the Chudasamas' accident and resulting injuries: (1) the brakes were likely to cause "the driver's unexpected loss of control ... in the highway environment of its expected use," and (2) the "doors, side panels and supporting members [were] inadequately designed and constructed, and fail[ed] to provide a reasonable degree of occupant safety so that they [were] unreasonably likely to crush and deform into the passenger compartment." Their complaint contained four counts: three standard products liability counts—strict liability, breach of implied warranty, and negligent design and manufacture—and one count of fraud. Each count sought compensatory damages to cover Mrs. Chudasama's medical bills and lost wages, to compensate her for pain and suffering, to compensate Mr. Chudasama for his loss of his wife's "society, companionship and services," and to cover the loss of the vehicle. All but the breach of implied warranty count also sought punitive damages.

Over the next two years, the parties engaged in protracted discovery disputes. As has become typical in recent years, both sides initially adopted extreme and unreasonable positions; the plaintiffs asked for almost every tangible piece of information or property possessed by the defendants, and the defendants offered next to nothing and took several steps to delay discovery. In this case, however, the district court never attempted to resolve the parties' disputes and force the

---

[2]Federal jurisdiction was based on diversity of citizenship under 28 U.S.C. § 1332 (1994). The Chudasamas are Georgia residents; Mazda Japan is a Japanese corporation; and Mazda America is a California corporation.

parties to meet somewhere in the middle of their respective extreme positions. As a result, what began as a relatively common discovery dispute quickly deteriorated into unbridled legal warfare.

We see no useful purpose in describing the drawn-out discovery battle in detail;[3] a relatively brief summary will suffice. On July 28, 1993, the Chudasamas served Mazda with their first interrogatories and requests for production. Both documents were models of vague and overly broad discovery requests. The production requests, for example, contained 20 "special instructions," 29 definitions, and 121 numbered requests (some containing as many as 11 subparts). Similarly, the interrogatories contained 18 "special instructions," 29 definitions, and 31 numbered interrogatories. "One" interrogatory included five separate questions that applied to each of the 121 numbered requests for production, arguably expanding the number of interrogatories to 635.[4]

The production requests all but asked for every document Mazda ever had in its possession and then some. For example, the Chudasamas sought detailed information about practically all of Mazda's employees worldwide. They requested production of

> all documents relating to organizational charts, books or manuals of Mazda ... which will or may assist in identifying an [sic] locating those operating divisions, committees, groups, departments, employees, and personnel ... involved in the conception, market analysis, development, testing, design safety engineering and marketing of the product for all years during which the product has been developed, designed, manufactured and marketed.

---

[3]The district court's docket sheet contains no fewer than ninety-five entries of discovery-related pleadings. The parties have further supplemented the record with hundreds of pages of additional unfiled correspondence between counsel for both sides and the court.

[4]The local rules in the Middle District of Georgia currently limit the number of production requests to 10 for each party and the number of interrogatories to 25 for each party without court approval. *See* M.D. Ga. Local R. 4.3, 4.4. The record shows that the Chudasamas neither requested nor received the approval of the district court to exceed these limits. Mazda specifically objected to this practice, and the Chudasamas contended that the rules in question came into force after their complaint was filed and therefore should not apply. The local rules became effective on June 2, 1993, just over a month after the complaint was filed. As became its standard operating procedure, the district court never ruled on Mazda's objection.

> We also note that, although Mazda never filed an objection under the Federal Rules of Civil Procedure, the 1993 amendments to the rules also imposed a limit of 25 interrogatories without leave of court. *See* Fed.R.Civ.P. 33(a). The applicability of these amendments is discussed *infra* note 32.

Record, vol. I, no. 20, at 17, produc. req. C.2. They also sought "all documents relating to any organizational chart or structure for each of Mazda['s] ... committees, sub-committees, boards, task forces, and technical groups which took any part in overseeing the design, market analysis, cost/benefits analysis, economic feasibility analysis, development, testing and safety engineering of the product." Record, vol. I, no. 20, at 18, produc. req. C.5.

The scope of these requests becomes apparent only after reading the Chudasamas' definition of the term "product":

> This word means the Mazda MPV Minivan involved in the incident *and all vehicles similar,* though not necessarily identical, to that Minivan. The word includes *all variations* of 1989 Mazda MPV Minivan vehicles, as well as all variations of the MPV Minivan vehicles produced by Mazda ... *in all years before and after the incident.* The term should be construed to include *each and every component part of the vehicle* and more specifically the related components of the assemblies and subassemblies of the vehicle's chassis, wheelbase, steering system, suspension system, braking system, side and side supporting system.

Record, vol. I, no. 20, at 9. The Chudasamas thus asked for production of nearly every document ever made that would list or assist in finding every person that ever had anything to do with any component of any year model of the MPV minivan "and all vehicles similar."

Another representative example of the breadth of discovery sought by the Chudasamas involves Mazda's advertising campaigns. They requested production of

> all documents relating to any print and broadcast media advertisements, catalogues, sales brochures, product inserts, or promotional information of any kind, relating to the product issued by or on behalf of Mazda ... for the purpose of marketing the product to consumers in the United States .... [or] in any other country where the product was marketed.

Record, vol. I, no. 20, at 23, produc. req. D.20, D.21. In other words, the Chudasamas wanted every document related to any form of advertising anywhere in the world of any year Mazda MPV minivan and "all vehicles similar" *and* all components thereof.

In addition to being broad, several requests were so vague as to be all but unintelligible. For example, the Chudasamas requested "all documents reflecting the conditions and circumstances of the environment of use of the product." Record, vol. I, no. 20, at 19, produc. req. D.2. "Environment of use" is defined by the Chudasamas as "real-world conditions to which motor

4

vehicles are actually exposed in their use by members of the public including, but not limited to, the occurrence of collisions and/or side-impacts." Record, vol. I, no. 20, at 6.

Other requests simply asked Mazda to research the Chudasamas' case. They requested "copies of any and all governmental statutes, regulations, or standards, industry standards, corporate standards, authoritative articles or treatises, which Mazda ... contends or admits are applicable to the design, development, testing, safety engineering or distribution of the product," Record, vol. I, no. 20, at 21, produc. req. D.12, and "all documents in [Mazda's] libraries ... which address the design, engineering, and manufacturing of cars and trucks that address brake failures and/or side-impact accidents, injuries, integrity, and/or crush," Record, vol. I, no. 20, at 28, produc. req. E.10.[5] Neither request was limited to documents prepared by or for Mazda or to documents relating to the "product." Again, we emphasize that the above examples are only a few representative samples.[6]

In response to the Chudasamas' excessively broad discovery requests, Mazda adopted four different strategies. First, it objected to almost every production request and interrogatory on almost every imaginable ground. While some of its objections were clearly boilerplate and bordered on being frivolous, many were directly on point and raised bona fide questions of law. On ten different occasions from September 7, 1993, until November 21, 1994, Mazda filed written objections to the Chudasamas' discovery requests. Moreover, during three different hearings in January, August, and September of 1994, Mazda asked the district court to rule on its objections *no fewer than twenty-five times,* all to no avail. Finally, on November 4, 1994, counsel for Mazda sent a letter to the court

---

[5]In lieu of the actual documents, the Chudasamas offered to allow Mazda to "simply furnish[ ] a *complete bibliography* thereof." Record, vol. I, no. 20, at 27, produc. req. E.10 (emphasis in original).

[6]The boundless discovery requests were not limited to production requests. For example, one of the interrogatories asks Mazda to "[i]dentify every document, every tangible thing, and every item of real or demonstrative evidence which is relevant to the subject matter of this action." Record, vol. I, no. 19, at 13, interrog. 8. Of course, the Chudasamas provide their own 25-part definition of "relevant to the subject matter of this action." Record, vol. I, no. 19, at 9-10.

imploring it to rule on three specific aspects of the Chudasamas' discovery requests.[7]  Mazda

apparently hoped that such rulings would limit the scope of discovery or, at the very least, clarify

its duties.  The district court never directly ruled on any of these objections or requests for rulings;

nor did it ever give any indication that it had considered them in even the most cursory fashion.

Accordingly, the Chudasamas continued their broad demands, unchecked by the district court.

On October 21, 1993, Mazda began pursuing a second strategy for countering the

Chudasamas' vague and overbroad discovery requests.  It filed a motion to dismiss their fraud count

for failure to plead fraud with particularity, pursuant to Fed.R.Civ.P. 9(b).[8]  Mazda contended that

the Chudasamas had failed to point to any specific misrepresentation made by Mazda.

The Chudasamas' fraud claim is based on the Federal Motor Vehicle Safety Standards,

promulgated by the National Highway and Traffic Safety Administration.[9]  They alleged in their

complaint that the MPV minivan only satisfied the standards that applied to "multipurpose" vehicles

(the "multipurpose standards") and not the standards applicable to "passenger cars" (the "car

---

[7]Specifically, it asked the court (1) to limit the Chudasamas' definition of "product," quoted *supra,* (2) to determine whether Mazda should produce documents relating to the recall of 1990-91 MPV minivans in addition to the recall of the 1989 MPV minivan involved in the case, and (3) to limit the Chudasamas' definition of the term "similar incidents" (another term broadly defined by the Chudasamas) to refer only to those incidents involving 1989 Mazda MPV minivans in which the brakes allegedly locked up or the right-side passenger compartment was alleged to be uncrashworthy.

[8]This rule requires that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity."  Fed.R.Civ.P. 9(b).

[9]The Chudasamas' complaint is an all-too-typical shotgun pleading.  The four counts it presents follow forty-three numbered paragraphs of factual allegations, many of which are vague.  Each count has two numbered paragraphs, the first of which incorporates by reference all forty-three paragraphs of factual allegations.  Many of the factual allegations appear to relate to only one or two counts, or to none of the counts at all.  Thus, a reader of the complaint must speculate as to which factual allegations pertain to which count.

As a result, discerning the Chudasamas' exact theory of fraud is no easy task. Now that the Chudasamas have been forced to articulate and develop their theory in response to Mazda's motion to dismiss and arguments on appeal, it has become clear that their claim is as we describe it in this opinion.

6

standards").[10]  Mazda "defrauded and deceived the American consuming public, including the plaintiffs and others similarly situated," the Chudasamas alleged, because it marketed the MPV minivan "as a family passenger car or vehicle intended to be used primarily for transporting adults and children."  This marketing scheme was fraudulent according to the complaint because Mazda "well knew" that the MPV minivan only met the multipurpose standards and not the car standards.[11]  Moreover, the complaint alleged, the Chudasamas "reasonably relied on the impression created" by this marketing scheme when they purchased their used minivan.[12]

---

[10]The Federal Motor Vehicle Standards are set out at subpart B of 49 C.F.R. § 571 (1996). The specific standard that the Chudasamas alleged the MPV minivan did not satisfy was standard 214 governing side-impact protection.  *See* 49 C.F.R. § 571.214. Before September 1, 1993, this standard applied only to "passenger cars." § 571.214(S2).  The term "passenger car" is defined as "a motor vehicle with motive power, *except a multipurpose passenger vehicle,* motorcycle, or trailer, designed to carry 10 persons or less." § 571.3(b) (emphasis added).  The term "multipurpose passenger vehicle" is defined as "a motor vehicle with motive power, except a trailer, designed to carry 10 persons or less which is constructed either on a truck chassis or with special features for occasional off-road operation."  *Id.*

[11]Mazda asserts, and the Chudasamas concede, that the MPV minivan is a "multipurpose passenger vehicle" (hence the initials "MPV") for purposes of the standards.  The Chudasamas therefore do not contend that the MPV minivan does not satisfy the applicable standards.

[12]The complaint does not indicate how Mazda's allegedly fraudulent marketing scheme caused the accident.  The remedies for fraud are generally limited to rescission, in which the buyer seeks to rescind the transaction by tendering a return of the item purchased and asking for a return of the purchase price, or damages, in which the buyer stands on the transaction and seeks damages for the difference between the value of the product as represented and its actual value at the time of purchase.  *See generally* 2 Fowler V. Harper et al., *The Law of Torts* § 7.15 (2d ed.1986).  Because the Chudasamas purchased the MPV minivan from a used car lot, we question whether the Chudasamas could have pursued either claim for relief against Mazda, as opposed to the used car dealer.

   The complaint makes clear, however, that the Chudasamas do not seek either form of relief.  Rather, as indicated in the text, they seek compensatory and punitive damages relating to the accident.  We assume that the Chudasamas intend to establish causation by employing the "but-for" theory of causation:  Had Mazda not duped them into purchasing the MPV minivan, the accident would never have occurred.  The Chudusamas have not represented—in their memoranda to the district court or in their brief to this court—that Georgia law would recognize such a but-for theory of causation. In fact, a review of Georgia case law suggests otherwise.  *See, e.g., Black v. Georgia S. & Fla. Ry. Co.,* 202 Ga.App. 805, 807, 415 S.E.2d 705, 707 (1992) (distinguishing between but-for and proximate causation);  *Ekstedt v. Charter Med. Corp.,* 192 Ga.App. 248, 384 S.E.2d 276, 277 (1989) (rejecting fraud claim for lack of evidence of proximate cause);  *Citizens Bank of Ball Ground v. Johnson,* 191 Ga.App. 155, 158, 381 S.E.2d 121, 124 (1989) (same).  We briefly address two other apparent deficiencies to the fraud claim

Mazda recognized that the fraud count substantially widened the scope of discovery. Absent the fraud count, the only information that the Chudasamas would be entitled to discover would be information related to the 1989 MPV minivan's brakes and side structure. The fraud count, however, arguably widened the scope of discovery to include information relating to Mazda's intentions in designing and marketing the MPV minivans, and possibly other "vehicles similar." Therefore, if Mazda could convince the district court to dismiss the fraud count, discovery would become substantially more manageable.

In its motion to dismiss the fraud count, Mazda contended that the Chudasamas failed to allege the "time, place and content of the alleged misrepresentations." The Chudasamas' memorandum in opposition to Mazda's motion argued that the misrepresentations were made in advertisements they had viewed in the past. They needed discovery from Mazda, they said, to find out which particular advertisements they had viewed and relied upon.

Despite the fact that both parties fully briefed Mazda's motion to dismiss, the district court never ruled on it. Although Mazda frequently reminded the district court—over a period of time exceeding a year and a half—that the motion was pending, the only indication in the record that the district court even acknowledged the motion was a statement made at a hearing in August 1994 (over nine months after the motion was filed) suggesting that the motion would be considered after

---

*infra* at note 39.

8

discovery.[13] The motion thus remained pending[14] and failed to narrow the Chudasamas' discovery demands.

Mazda's third strategy was to seek a protective order. Much of the information requested by the Chudasamas involved confidential documents that went to the heart of Mazda's business. They sought, *inter alia,* marketing studies, internal memoranda, and documentation on the history of the development and design of the MPV minivan and other vehicles. Fearing disclosure of this information to its competitors or to other potential plaintiffs, Mazda sought a "non-sharing" protective order that would keep the information under seal and prohibit the Chudasamas from sharing Mazda's proprietary information with anyone. They filed a motion for such a protective order on August 16, 1994. The Chudasamas objected, but indicated that they would accept a "sharing" protective order that would allow them to share the information with similarly situated plaintiffs, but not with anyone else.

At a hearing in September 1994, Mazda offered to stipulate to a sharing protective order if the Chudasamas would narrow their proposed definition of similarly situated plaintiffs. The Chudasamas declined this invitation, and on September 15, 1994, the district court began an alarming trend by adopting nearly verbatim the proposed sharing protective order drafted by counsel

---

[13]After counsel for Mazda reiterated the need to rule on the motion, the court stated, "Let's go ahead with the discovery, and we can more clearly understand the fraud." Record, vol. 9, no. 70, at 65.

[14]Mazda amended the still-pending motion on June 22, 1995, to include a request that the fraud count be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) on the grounds that Mazda's advertisements, as described by the complaint, were not sufficient to support a claim of fraud. The only "statement" to be gleaned from the complaint was that the MPV minivan was a passenger vehicle intended to transport adults and children. Mazda contended that this statement not only was not misleading, it was entirely accurate, especially in view of the standard's definition of "multipurpose passenger vehicles."

Mazda further contended that the Chudasamas' allegation of reliance was refuted by their own testimony. The motion alleged that Mr. Chudasama admitted in a deposition both that he could not remember viewing any specific advertisements and that he did not rely on any advertisements in purchasing the MPV minivan.

for the Chudasamas.[15] If nothing more, however, the sharing protective order issued by the court provided for the protection of Mazda's confidential information from disclosure to its competitors.

Perhaps because it realized that the district court had no intention of ruling on its motion to dismiss the fraud count or its various objections, Mazda adopted a fourth strategy; it withheld a substantial amount of information that it later conceded was properly discoverable. Early in the litigation, Mazda Japan moved to dismiss the Chudasamas' claims against it based on alleged deficiencies in their service of process.[16] Although the district court denied its motion in August 1993, Mazda Japan refused to participate in discovery until the district court denied its motion for reconsideration in January 1994, out of fear that its objections would be deemed waived if it participated. Because Mazda Japan and Mazda America were represented by the same counsel, Mazda Japan in effect received the benefits of Mazda America's discovery without suffering the burden of complying with the Chudasamas' requests. This was a particularly effective strategic advantage because Mazda America contended that most of the documents and information sought by the Chudasamas were in Mazda Japan's possession.

On November 12, 1993, the Chudasamas filed a motion to compel Mazda to respond "fully and completely" to a laundry list of their interrogatories and requests for production.[17] They also sought attorneys' fees. The motion alleged that Mazda had only provided "evasive and incomplete"

---

[15]The order proposed by the Chudasamas' counsel and the order actually entered by the district court are perfectly identical in all but one respect. The proposed order begins with the clause, "With the consent of counsel for the plaintiffs and counsel for the defendants." The actual order also begins with this clause, but the clause has been crossed out.

[16]Specifically, Mazda Japan contended that the Chudasamas' service of process did not conform to the requirements of the Hague Convention because it did not include copies of the summons and complaint translated into Japanese. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Jan. 8, 1969, art. 5, 20 U.S.T. 361, 658 U.N.T.S. 163.

[17]This list omitted several discovery requests that were either redundant in light of other requests included on the list or obviously lifted from other unrelated cases. We note that all the examples quoted *supra* were included in the list.

responses and that Mazda's objections were all too general, improperly asserted, or simply without merit.

The district court held a hearing on January 21, 1994, to address the discovery disputes. Counsel for the Chudasamas and counsel for Mazda discussed the various disputed issues at the hearing, and Mazda repeatedly asked the court to rule on its objections.[18] The district court remained silent throughout most of the hearing, and at the end of the hearing made it clear that it did not want to rule on any objections or motions relating to discovery and warned that, if forced to rule, it would be inclined to issue sanctions "on somebody."[19] Instead of managing the disputes itself, the

---

[18]For example, counsel for Mazda recommended that the parties "go through the objections one by one and simply have [the court] rule on them or have them referred to a magistrate or a special master and have him rule on them." Record, vol. 7, no. 57, at 11-12.

[19]The court warned:

> I don't know—you fellows seem to be having so much trouble even agreeing on what is pertinent in the case.
>
> Well, if I have to take hold of the thing myself—like I do not want to do—but if I have to take hold of it and straighten it out, I'm going to impose some sanctions on somebody, because it sounds to me like a case that's leading in that direction.
>
> I don't know who, either plaintiff or the defendant. If I get the impression that somebody's just deliberately confusing the thing and fouling it up and making it impossible and throwing it on the Court needlessly, I'm going to put a penalty on somebody, one way or another, about it, either plaintiffs' lawyers or the defendants' lawyers, one or the other; in the way of attorney's fees or some other type of sanction.

Record, vol. 7, no. 57, at 30-31.

11

court wanted the parties to confer and settle the disputes on their own.[20] The hearing thus ended without any rulings from the bench.

On January 26, Mazda filed amended objections and responses to the Chudasamas' requests. Approximately six months later, on August 8, 1994, the Chudasamas renewed their motion to compel. Mazda filed its motion for protective order, discussed *supra,* on August 16, and the district court conducted a status conference on August 17. As was the case in the January hearing, most of the conference consisted of the attorneys stating their grievances. After reminding the court that its motion to dismiss the fraud count was fully briefed and pending and that it had filed numerous discovery objections on which the court had yet to rule,[21] Mazda indicated that it was withholding a substantial amount of information until the court either entered a protective order or conclusively determined that no protective order would be entered. Consistent with its approach at the previous hearing, the district court declined to rule on Mazda's motion or objections. The hearing concluded with the understanding that the attorneys would negotiate a protective order and that Mazda would disclose the withheld discovery shortly thereafter. As noted above, the parties tried to negotiate a stipulated protective order and failed, and the court adopted the plaintiffs' version of the order—verbatim—on September 15.

---

[20]Specifically, the court stated:

> Well, I tell you what let's do. Let's see what you can do about getting together on what your problem is. And, if [counsel for the Chudasamas] is still of the attitude that he thinks he needs to pursue his Motion to Compel, he can just let me know that he still thinks he's got to proceed with his motion. And we'll just proceed to rule on the motion. That's all I know. I hope it won't reach that stage.

Record, vol. 7, no. 57, at 33.

[21]Regarding the objections, counsel for Mazda argued that Mazda was "entitled to object, argue that objection and have [the court] rule on it." Record, vol. 9, no. 70, at 50. Later, counsel for Mazda complained to the court that the Chudasamas were "trying to turn this products case into a fraud case. [Mazda has] made a motion to dismiss the fraud cause of action on a number of different grounds. It's been fully briefed and pending before [the court]." Record, vol. 9, no. 70, at 65.

12

After Mazda disclosed the withheld discovery, the district court held another status conference on September 30. Like the previous two hearings, the court spent most of the hearing simply listening to the attorneys present their grievances. This time, however, the court indicated about halfway through the hearing that it was not interested in hearing Mazda's objections, but simply wanted counsel for the Chudasamas to summarize the state of discovery on each of the discovery requests in dispute. Although Mazda again made clear that it needed a ruling on its various objections,[22] this conference ended like the previous two—without a ruling from the bench.

As mentioned previously, counsel for Mazda wrote a letter to the court on November 4, imploring the court to rule on three specific issues. Mazda received no response. On November 28, counsel for the Chudasamas wrote a letter complaining about Mazda's responses. This letter contained a new laundry list of discovery requests to which they had not received satisfactory responses from Mazda.[23] They thus sought an order to compel Mazda to respond. Unlike the letter from Mazda's counsel, this letter received prompt treatment by the district court. Three days later, on December 1, 1994, the court granted the Chudasamas' motion and entered a compel order incorporating the laundry list set out in the November 28 letter.

The order contained three paragraphs. The first excoriated Mazda for its conduct in the discovery disputes. The second paragraph contained the details of the order. It directed Mazda to "make complete, proper, non-evasive responses to" the listed interrogatories and production requests. The order directed that Mazda comply within fifteen days of the date of the order and concluded in its final paragraph with the warning: "Upon failure of the Defendants to comply with this order it will be the Court's intention to impose the ultimate sanction of judgment by default."

---

[22]Counsel for Mazda stated, "There are some objections here that we have made that we cannot go beyond that we would like the court to rule on, which we don't think we can negotiate it further and reach a compromise.... [W]e are frankly prepared for [the court] to rule on these matters." Record, vol. 10, no. 94, at 99-100.

[23]As with the list contained in their motion, this list did not include all the Chudasamas' original requests, but did contain all the requests discussed earlier in this opinion as well as many more of a similarly broad or vague nature.

13

December 1 was clearly a turning point in the case. Although the order made no mention of Mazda's objections or motion to dismiss, Mazda assumed that all of its objections had been implicitly overruled. The Chudasamas' broad and vague discovery requests were no longer simply the initial, unreasonable discovery demands that had become commonplace. They had been transformed undiluted into the court's unqualified mandate. Although the listed discovery requests were practically impossible to satisfy with any degree of certainty, Mazda had no more than fifteen days[24] in which to satisfy the Chudasamas' excessive demands, on pain of a default judgment.

While it certainly could not hope to satisfy the plaintiffs, Mazda made a near-herculean effort to comply. It gathered four boxes of documents from all over the world, documents that it had hoped it would never need to compile based on its objections. Sometime in the afternoon of Friday, December 16, the date compliance was due, counsel for Mazda in Atlanta telephoned the Chudasamas' counsel to report that Mazda's responses had been compiled and were ready for delivery. He offered to hand deliver the responses to the Chudasamas' counsel at his office in Blakely, Georgia, almost 200 miles away. When he stated that he would be unable to reach Blakely until after five o'clock, counsel for the Chudasamas refused to accept delivery either that day or the following day, a Saturday, because he did not want to wait at the office or ask any of his employees to stay late. Accordingly, counsel for Mazda arranged to have the responses delivered by private courier on Monday, December 19.

Not only did the Chudasamas' counsel refuse to accept Mazda's responses after five o'clock on the day they were due, he drafted a motion for sanctions *that very day.* The motion requested that the court strike Mazda's answers and enter a default judgment against Mazda on all four counts of the complaint, leaving damages as the only issue to be litigated on the merits. The motion was filed on December 19, the day the Chudasamas' counsel received Mazda's responses. Counsel therefore

---

[24]Mazda has contended, both before the district court and on appeal, that it did not receive the December 1 order in the mail until December 5, and therefore only had eleven days in which to reply.

14

filed the motion before he could determine whether Mazda's responses, though possibly a day late,[25] provided "complete, proper, non-evasive responses" as required by the compel order.

Counsel for the Chudasamas filed an amended motion on December 21. The amendments contained a number of technical objections to Mazda's attempt to comply with the order.[26] On March 2 and 9, 1995, the Chudasamas' counsel augmented his amended motion with two affidavits in which he presented several grounds for default. In addition to arguing that Mazda's responses were late and suffered several technical deficiencies, he also stated that Mazda had not provided "complete, proper, non-evasive responses" as directed by the compel order.

---

[25]The Federal Rules of Civil Procedure provide the rule for service of pleadings and papers, including "every paper relating to discovery required to be served upon a party." Fed.R.Civ.P. 5(a). They provide that "[s]ervice by mail is complete upon mailing." Fed.R.Civ.P. 5(b). Mazda delivered its responses to the private courier on the date they were due and thus argued below that its responses were not late. The Chudasamas contended that "mailing" in Rule 5(b) only refers to the United States mail and therefore Mazda was one day late.

     While this argument seems strange in light of the fact that it would have taken longer for the Chudasamas to receive the responses had they been mailed, we note that there are authorities supporting each side. *Compare Magnuson v. Video Yesteryear,* 85 F.3d 1424, 1430-31 (9th Cir.1996) ("mailing" does not include use of private courier), *with United States v. 63-29 Trimble Rd.,* 812 F.Supp. 332, 334 (E.D.N.Y.1992) ("mailing" does include use of private courier), *and Edmond v. United States Postal Serv.,* 727 F.Supp. 7, 11 (D.D.C.1989) (same), *aff'd in part and rev'd in part,* 949 F.2d 415 (D.C. Cir.1991).

     At any rate, we have no need to resolve this issue at this time. While the district court concluded in its sanctions order that "[s]ervice by courier is not complete under the rule until the pleading or other paper is handed to the [opposing] counsel or delivered to his office," it revealed this conclusion to be dicta by "mak[ing] clear that sanctions are not being imposed here merely because the Defendants were a few days late in serving their responses." For purposes of this opinion, we will assume that Mazda's responses were a day late.

[26]For example, the motion was based in part on the fact that some of the responses were improperly initialed by someone other than counsel of record. Record, vol. 4, no. 86, at 2. The motion further complained that Mazda's counsel "falsely signed a certificate of service stating that the supplemental responses ... were deposited in the United States mail," even though they were actually shipped by a private courier. *Id.* at 3. The amended motion also alleged that the responses were incomplete, but admitted that "plaintiff's counsel has not had sufficient time to make an elaborate comparison between [the responses] and the many prior answers filed by" Mazda. *Id.*

Before receiving any response from Mazda to the allegations in the two affidavits, the court informed the parties by letter on March 23, 1995, that it intended to grant the Chudasamas' motion. It further requested counsel for the Chudasamas to draft "an appropriate opinion and order, setting forth a narrative history of this matter." On March 30, Mazda moved the court to hold a hearing on the issue and sought leave to respond to the affidavits. The court granted both requests, and on April 19, Mazda filed a comprehensive memorandum addressing the allegations in the two affidavits.

The sanctions hearing, held on April 24, 1995, followed the pattern of the previous three discovery hearings: counsel for both sides presented their arguments, while the court remained mostly silent, made few comments, and did not ask any substantive questions. At the conclusion of the hearing, the court admitted that it had only skimmed through Mazda's memorandum. It pledged to give Mazda's submission more thorough consideration and indicated that it would issue a ruling shortly thereafter.

On April 26, the court again informed the parties by letter that it intended to grant the motion for sanctions. It again asked the Chudasamas' counsel to draft the opinion and order. It directed that a copy of the proposed order be delivered to Mazda for comment.

Counsel for the Chudasamas delivered an eighty-six-page proposed order on May 1, to Mazda. On May 30, Mazda filed a comprehensive memorandum in response. That same day, it also filed a motion for reconsideration or clarification of the December 1 compel order. Mazda contended that compliance with the literal terms of the order was all but impossible and asked the court for guidance as to what deficiencies it perceived in Mazda's responses. During this time, Mazda continued to supplement its responses to the Chudasamas' discovery requests. On June 22, it produced documents which it now concedes were "responsive to legitimate discovery requests and should have been produced at an earlier stage of the litigation." Brief at 16. These documents related to a federal recall of the MPV minivan and arguably suggested that Mazda had deceived the National Highway and Traffic Safety Administration.

On June 26, 1995, the court issued an opinion and order granting the Chudasamas' motion for sanctions (the "sanctions order"). The seventy-page order was largely identical to the proposed order drafted by counsel for the Chudasamas, except that sixteen pages of material had been deleted. In its order, the court struck Mazda's answers and affirmative defenses and directed the clerk to enter a "default judgment"[27] in favor of the Chudasamas. The order noted that a jury trial would be required to determine the amount of damages. The order also directed Mazda to pay the Chudasamas' expenses, including attorneys' fees. Finally, the order vacated the previously entered protective order.[28]

Mazda sought appellate review through two avenues. First, on June 30, 1995, it moved for a stay of the vacatur of the protective order pending appeal and for certification under 28 U.S.C. § 1292(b).[29] The district court denied the stay, but amended its June 26 order to include a 1292(b) certification. Mazda also filed a notice of appeal on July 14, 1995. The clerk of this court assigned number number 95-8896 to that appeal. On July 26, a panel of this court granted Mazda permission

---

[27]Although the Chudasamas requested that a "default judgment" be entered; the court directed that a "default judgment" be entered; and the district court clerk filed a document entitled "default judgment," no judgment has been entered in this case. Defaults are governed by Rule 55. The clerk is required to enter a "default" when a party against whom relief is sought fails to "plead or otherwise defend" the claim. Fed.R.Civ.P. 55(a). The clerk can only enter a "judgment by default" if the "plaintiff's claim ... is for a sum certain or for a sum which can by computation be made certain." Fed.R.Civ.P. 55(b)(1).

> When the amount of damages is in dispute, as in the instant case, only the court may enter judgment, and then only after determining the amount of damages. *See* Fed.R.Civ.P. 55(b)(2). There can be no "judgment" without a determination of relief. Thus, the document entitled "default judgment" in this case is more properly termed simply a "default."

[28]The Chudasamas did not seek this relief in their motion for sanctions, and it was not discussed at any hearing. Moreover, the court's letter requesting counsel for the Chudasamas to draft the sanctions order also made no mention of such relief. We can only presume that counsel for the Chudasamas seized the opportunity to overreach granted by the district court and included this relief either out of spite or for personal gain. Such relief certainly had no beneficial effect on the interests of his clients.

[29]This provision allows a district judge to certify an interlocutory order for immediate appeal if the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and ... an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b) (1994).

to appeal the sanctions order under section 1292(b), "but only as to that part of the order vacating the Protective Order."[30] The panel also granted Mazda a stay pending appeal of the district court's sanctions order to the extent that that order vacated the protective order. The clerk assigned number 95-8921 to the section 1292(b) appeal. The two numbered appeals were consolidated as they both seek review of the same order.

## II.

We begin our analysis by briefly addressing the scope of our jurisdiction in this case. As mentioned *supra,* another panel of this court granted Mazda permission to proceed with the section 1292(b) appeal, "but only as to that part of the order vacating the Protective Order." While this language implies that our jurisdiction is limited to one part of the sanctions order, there is no such limitation. *See Yamaha Motor Corp. v. Calhoun,* --- U.S. ----, ----, 116 S.Ct. 619, 623, 133 L.Ed.2d 578 (1996); *United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1554 n. 2 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). On the contrary, a court of appeals simply has no power to limit its jurisdiction to certain issues. *See generally Edwardsville Nat'l Bank & Trust Co. v. Marion Lab. Inc.,* 808 F.2d 648, 650 (7th Cir.1987) ("[Section 1292(b) ] refers to certifying an "order' for interlocutory appeal. It is not a method of certifying questions."). We therefore have jurisdiction to review the entire sanctions order.[31]

Because the sanctions order was issued in part for Mazda's purported violation of the district court's compel order, we must also review that earlier order. Although the compel order is clearly an interlocutory order over which we would not normally have jurisdiction, we may exercise pendent appellate jurisdiction "when a nonappealable decision is "inextricably intertwined' with an appealable decision or when "review of the former decision [is] necessary to ensure meaningful

---

[30]Section 1292(b) grants courts of appeals discretion whether to accept interlocutory jurisdiction over a certain order.

[31]Mazda argues that we also have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 (1994), under the collateral order doctrine announced in *Cohen v. Beneficial Indus. Loan* Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Because our jurisdiction under § 1292(b) is clear, we do not address this argument.

18

review of the latter.' " *United States v. Lopez-Lukis,* 102 F.3d 1164, 1167 n. 10 (11th Cir.1997) (quoting *Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 1212, 131 L.Ed.2d 60 (1995)). "Meaningful review" of the sanctions order clearly requires review of the compel order. As we discuss below, the propriety of the sanctions order depends in large part on the propriety of the compel order. We therefore have jurisdiction to review the compel order as well as the sanctions order.

### III.

The district court based its decision to impose sanctions on Rules 37(b)(2) and 26(g) of the Federal Rules of Civil Procedure. Although the order contained several sanctions, it gave no indication as to which sanctions were imposed under which rule. Because the framework for imposing sanctions differs under the two rules, we analyze the propriety of the entire order under both rules. The order must stand unless it cannot be supported by either rule. Because Rule 37(b)(2) explicitly contemplates the sanction of default, which is at the heart of the order, we analyze the sanctions order under this rule first. We review the propriety of the sanctions order under Rule 26(g) in part IV.

Rule 37 authorizes a district court to impose such sanctions "as are just" against a party that violates an order compelling discovery. Fed.R.Civ.P. 37(b)(2).[32] Included in the rule's list of possible sanctions is an order striking a defendant's answer and entering a default. Fed.R.Civ.P.

---

[32]The rules governing discovery were amended on April 22, 1993. The amendments became effective on December 1, 1993, just over seven months after the Chudasamas' filed their complaint. The Supreme Court has ordered that these amendments apply "insofar as just and practicable, [to] all proceedings in civil cases ... pending" on December 1, 1993. Order of April 22, 1993, *Orders of the Supreme Court of the United States Adopting and Amending Rules,* Fed.R.Civ.P. Rules 1-11, 28 U.S.C.A. at 23 (Supp.1997); *see also Reed v. Binder,* 165 F.R.D. 424, 428 n. 4 (D.N.J.1996) (noting that courts have generally applied amendments retroactively "to the maximum extent possible").

We see no reason why the amendments should not have governed the proceedings in this case after December 1, 1993. With few exceptions, the amendments did not materially change the duties of the parties or the court. Although discovery in this case began before the effective date, the vast majority of the discovery-related motions and all the hearings and court orders came well after that date. For these reasons, unless otherwise noted, we quote from and refer to the amended version of the rules.

37(b)(2)(C). District courts enjoy substantial discretion in deciding whether and how to impose sanctions under Rule 37. *See Malautea v. Suzuki Motor Co.,* 987 F.2d 1536, 1542 (11th Cir.), *cert. denied,* 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993). We accordingly review such orders for abuse of discretion. *See Maddow v. Procter & Gamble Co.,* 107 F.3d 846, 853 (11th Cir.1997). When reviewing an order striking a defendant's pleadings, our "review should be particularly scrupulous lest the district court too lightly resort to this extreme sanction, amounting to judgment against the defendant without an opportunity to be heard on the merits." *Emerick v. Fenick Indus.,* 539 F.2d 1379, 1381 (5th Cir.1976).[33]

To the extent that the district court based its sanctions order on Rule 37(b), the propriety of that order depends in large part on the propriety of the earlier compel order. *See GFI Computer Indus. v. Fry,* 476 F.2d 1, 5 (5th Cir.1973) (reversing order of default imposed for violation of erroneously entered order). We review orders compelling discovery under the same abuse of discretion standard. *Maddow,* 107 F.3d at 853. In evaluating whether a district court abuses its discretion when it imposes severe sanctions upon a party that violates an order, we believe that an important factor is whether the entry of that order was itself an abuse of discretion.[34] We therefore focus our analysis in part A on the district court's decision to compel discovery and conclude that it was an abuse of discretion. In part B, we return to the sanctions order proper and draw the same conclusion.

## A.

We find that the district court's decision to compel discovery in this case was an abuse of discretion. We draw this conclusion based on the district court's failure adequately to manage this

---

[33]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[34]Because we expect litigants to obey all orders, even those they believe were improvidently entered, sanctions will very often be sustained, particularly when the infirmity of the violated order is not clear and the sanctions imposed are moderate. This case presents neither of these circumstances.

case. District courts must take an active role in managing cases on their docket. *See generally Hoffmann-La Roche Inc. v. Sperling,* 493 U.S. 165, 171, 110 S.Ct. 482, 487, 107 L.Ed.2d 480 (1989) (emphasizing "wisdom and necessity for early judicial intervention in the management of litigation"); William W. Schwarzer, *Managing Civil Litigation: The Trial Judge's Role,* 61 Judicature 400, 402, 404 (1978) (urging district judges to adopt more active role in pretrial proceedings, especially in managing discovery disputes), *cited in Hoffmann-La Roche,* 493 U.S. at 171, 110 S.Ct. at 487.

We recognize that district courts enjoy broad discretion in deciding how best to manage the cases before them. *See, e.g., United States v. McCutcheon,* 86 F.3d 187, 190 (11th Cir.1996). This discretion is not unfettered, however. When a litigant's rights are materially prejudiced by the district court's mismanagement of a case, we must redress the abuse of discretion. The mismanagement of two key parts of this case—Mazda's motion to dismiss the Chudasamas' fraud claim and Mazda's resistance to the Chudasamas' discovery requests—indicates that the district court abused its discretion.

### 1.

Failure to consider and rule on significant pretrial motions before issuing dispositive orders can be an abuse of discretion. *See, e.g., In re School Asbestos Litig.,* 977 F.2d 764, 792-93 (3d Cir.1992) (granting writ of mandamus as remedy for district court's "arbitrar[y] refus[al] to rule on a summary judgment motion"); *Ellison v. Ford Motor Co.,* 847 F.2d 297, 300-01 (6th Cir.1988) (finding district court's failure to rule on motion to amend complaint before granting summary judgment abuse of discretion); *McDonnell Douglas Corp. v. Polin,* 429 F.2d 30, 31 (3d Cir.1970) (directing district court to consider and rule on motion to transfer before discovery on the merits of the case (but after discovery related solely to transfer issue)). Resolution of a pretrial motion that turns on findings of fact—for example, a motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2)—may require some limited discovery before a meaningful ruling can be made. Facial challenges to the legal sufficiency of a claim or defense, such as a motion to dismiss

21

based on failure to state a claim for relief,[35] should, however, be resolved before discovery begins. Such a dispute always presents a purely legal question; there are no issues of fact because the allegations contained in the pleading are presumed to be true. *See Mitchell v. Duval County Sch. Bd.,* 107 F.3d 837, 838 n. 1 (11th Cir.1997) (per curiam). Therefore, neither the parties nor the court have any need for discovery before the court rules on the motion. *See Kaylor v. Fields,* 661 F.2d 1177, 1184 (8th Cir.1981) ("Discovery should follow the filing of a well-pleaded complaint. It is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim.").

Although mechanisms for effective discovery are essential to the fairness of our system of litigation, *see generally* 6 James Wm. Moore et al., Moore's Federal Practice § 26.02 (3d ed.1997) (outlining beneficial purposes of discovery), they also carry significant costs, *see generally* Maurice Rosenberg, *Federal Rules of Civil Procedure in Action: Assessing Their Impact,* 137 U. Pa. L.Rev. 2197, 2204-05 (1989) (discussing costs and noting that in survey of 1000 judges, "abusive discovery was rated highest among the reasons for the high cost of litigation"). Discovery imposes several costs on the litigant from whom discovery is sought. These burdens include the time spent searching for and compiling relevant documents; the time, expense, and aggravation of preparing for and attending depositions; the costs of copying and shipping documents; and the attorneys' fees generated in interpreting discovery requests, drafting responses to interrogatories and coordinating responses to production requests, advising the client as to which documents should be disclosed and which ones withheld, and determining whether certain information is privileged. The party seeking discovery also bears costs, including attorneys' fees generated in drafting discovery requests and reviewing the opponent's objections and responses. Both parties incur costs related to the delay discovery imposes on reaching the merits of the case. Finally, discovery imposes burdens on the

---

[35]We note that these observations would apply with equal force to challenges to the sufficiency of affirmative defenses, counterclaims, or cross-claims found in any party's pleadings. The district court should resolve all such disputes as early as possible for the reasons we state. We focus on motions to dismiss by defendants only because this case involves such a motion.

judicial system;[36] scarce judicial resources must be diverted from other cases to resolve discovery disputes.

If the district court dismisses a nonmeritorious claim before discovery has begun, unnecessary costs to the litigants and to the court system can be avoided. Conversely, delaying ruling on a motion to dismiss such a claim until after the parties complete discovery encourages abusive discovery and, if the court ultimately dismisses the claim, imposes unnecessary costs. For these reasons, any legally unsupported claim that would unduly enlarge the scope of discovery[37] should be eliminated before the discovery stage, if possible.[38] Allowing a case to proceed through the pretrial processes with an invalid claim that increases the costs of the case does nothing but waste the resources of the litigants in the action before the court, delay resolution of disputes

---

[36]For instance, as discussed *infra* part IV, Rule 26(g)(2)(C) requires the parties to certify, on pain of mandatory sanctions, that all discovery requests, responses, or objections are not "unreasonably or unduly burdensome or expensive." Failure to rule on a motion to dismiss a claim impacting the needs of the case clouds the parties' ability to certify and hinders their ability to conduct appropriate discovery. Allowing a dubious claim that impacts the needs of the case to remain in the lawsuit without a meaningful ruling from the court therefore prevents discovery from proceeding smoothly and efficiently.

[37]The scope of allowable discovery is determined by the claims (and defenses) raised in the case. The rules describe the general scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to *the claim or defense of the party seeking discovery* or to *the claim or defense of any other party,* including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1) (emphasis added).

[38]Moreover, the ruling must be meaningful. It is not enough simply to deny a motion to dismiss a claim with little or no comment and then revisit the defendant's legal contentions when the defendant files a motion for summary judgment after discovery has concluded. We realize that the Civil Justice Reform Act has led to strict case management deadlines, making it difficult for district courts to take the time to consider pretrial motions closely. *See* 28 U.S.C. § 471 (1994) (requiring district courts to implement plans intended in part to "ensure just, speedy, and inexpensive resolutions of civil disputes"). Nonetheless, district courts simply must not allow the most critical pretrial motions to be carried with the case until the final pretrial conference unless to do so is absolutely necessary.

between other litigants, squander scarce judicial resources, and damage the integrity and the public's perception of the federal judicial system.

In sum, as the burdens of allowing a dubious claim to remain in the lawsuit increase, so too does the duty of the district court finally to determine the validity of the claim. Thus, when faced with a motion to dismiss a claim for relief that significantly enlarges the scope of discovery, the district court should rule on the motion before entering discovery orders, if possible. The court's duty in this regard becomes all the more imperative when the contested claim is especially dubious.

Turning to the facts of the instant case, we note that even the most cursory review of the Chudasamas' shotgun complaint reveals that it contains a fraud count that is novel and of questionable validity. Upon reading the complaint, the district court should have noted that the fraud count dramatically enlarged the scope of the Chudasamas' case. Without the fraud theory, the scope of discovery likely would have been limited to information tending to show that the MPV minivan was a defective product and that Mazda was negligent in designing it. With the fraud theory in the case, on the other hand, the scope of discovery broadened to include, *inter alia,* Mazda's marketing strategies and safety testing. As a result, the Chudasamas could seek much broader discovery with the fraud count in the complaint than without it. The presence of the fraud count accordingly contributed greatly to the discovery disputes. Furthermore, as long as the fraud claim remained in the case without a dispositive ruling from the bench, any analysis of "the needs of the case," as required of the court by Rule 26(b)(2) and of the litigants by Rule 26(g)(2)(C), would be hindered. As a result, Mazda faced significant uncertainty in certifying that any of its responses were "complete, proper, and non-evasive."

Many, if not most, of these problems could have been solved had the district court simply ruled on Mazda's motion to dismiss the fraud claim. Had it granted the motion, then the Chudasamas would have been forced to narrow the scope of their discovery requests considerably. Had it denied the motion and ruled that the Chudasamas had stated a claim for fraud, then Mazda would have been forced to accept a broader view of discoverable information.

24

The dubious nature of the fraud count made the need for a ruling even more imperative. While the question of whether the Chudasamas' allegations of fraud state a claim for relief is not directly before us, we find it hard to believe that Georgia law would recognize such a claim.[39] At

[39]The Chudasamas do not cite a single reported products liability case in the United States, much less in Georgia or the Eleventh Circuit, that has recognized the fraud theory they allege (i.e., a fraud claim based on advertisements of a product that does not meet an inapplicable federal safety standard). *Cf. Logan Equip. Corp. v. Simon Aerials, Inc.,* 736 F.Supp. 1188, 1200-02 (D.Mass.1990) (fraud claim based on statement that product complied with *applicable* standards); *Geo. Byers Sons, Inc. v. East Europe Import Export, Inc.,* 488 F.Supp. 574, 582-83 (D.Md.1980) (same).

Under Georgia law, "[t]he tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." *Crawford v. Williams,* 258 Ga. 806, 806, 375 S.E.2d 223, 224 (1989). Aside from problems with the damages they seek, *see supra* note 12, the Chudasamas' allegations appear deficient with regard to at least two of these elements. First, they must prove a "false misrepresentation." Although the Chudasamas' correctly point out that an express misrepresentation is not required, *see* O.C.G.A. § 51-6-4 (1982) (providing that fraud can be shown by acts or silence); *Sapp v. ABC Credit & Inv. Co.,* 243 Ga. 151, 157, 253 S.E.2d 82, 86 (1979) ("There are infinite means by which it can be accomplished.... It may be perpetrated by signs and tricks, and even silence may in some instances amount to fraud.") (citation to original omitted), they must prove that Mazda somehow misled them.

The Chudasamas characterize Mazda's alleged deceptive practice as "false advertising." Answer Br. at 8-9, 37. They contend that by advertising the MPV minivan as a "vehicle intended to be used primarily for transporting adults and children," Mazda "deceived" them into believing that the MPV met the federal standards for cars. They concede that (1) that standard does not apply to the MPV minivan and (2) the MPV minivan complies with the applicable multipurpose passenger vehicle standard, which applies to "motor vehicle[s] designed to carry 10 persons or less which [are] constructed either on a truck chassis or with special features for occasional off-road operation." *See supra* note 10. Nothing in the federal standards suggests that the car standards provide sufficient safety for the transportation of adults and children, while the multipurpose vehicle standards do not. In the face of these facts, how the advertisement described by the Chudasamas could possibly be characterized as false or deceptive is beyond our comprehension.

The second glaring problem with their fraud claim is the allegation that they relied on Mazda's "false" advertising. The Chudasamas failed to allege that they were even aware that the federal government imposed different safety standards on "multipurpose passenger vehicles," which the MPV minivan was, and on "passenger cars," which the minivan was not.

Georgia law clearly requires proof of reasonable reliance for a claim of fraud. *See, e.g., Cobb County Sch. Dist. v. MAT Factory, Inc.,* 215 Ga.App. 697, 700-01, 452 S.E.2d 140, 144 (1994) (holding that without proof of justifiable reliance, fraud "claim tumbles like a house of cards"). As a threshold matter, the Chudasamas must prove they

25

any rate, we conclude that this claim was dubious enough to require the district court to rule on Mazda's motion to dismiss prior to entering the compel order. When the court refused to do so and, instead, allowed the case to proceed through discovery without an analysis of the fraud claim, it abused its discretion.

2.

By and large, the Federal Rules of Civil Procedure are designed to minimize the need for judicial intervention into discovery matters. They do not eliminate that need, however. *See ACF Indus. v. E.E.O.C.,* 439 U.S. 1081, 1087, 99 S.Ct. 865, 869, 59 L.Ed.2d 52 (1979) (Powell, J. dissenting from denial of certiorari) ("With respect to abuse of discovery ... there is a pressing need for judicial supervision...."); *Malautea,* 987 F.2d at 1547 (Roney, J., concurring) (noting that "failure of busy courts to properly monitor the use of discovery procedures" is partially to blame for "improper discovery activity which unnecessarily prolongs and raises the costs of litigation"). When the parties to a case inform the court that there are objections to discovery requests that they cannot

---

actually relied on Mazda's advertisements when they bought the MPV minivan. Mazda contends that they have admitted, during a pretrial deposition, that they did not so rely. At any rate, their complaint failed to point to any specific advertisement on which they allegedly relied.

The Chudasamas seek to overcome these obstacles with a unique "fraud on the market" theory. Because Mazda subjected "the whole market" to its deceptive advertising, they argue, reliance should be presumed. Answer Br. at 37-38. They do not cite a single Georgia case applying this doctrine (probably because there is no such case). Instead, they cite several federal securities law cases. The fraud on the market theory of securities law, however, is based on concepts and policies that simply do not apply in a products liability case. *See generally Basic Inc. v. Levinson,* 485 U.S. 224, 241-45, 108 S.Ct. 978, 988-90, 99 L.Ed.2d 194 (1988) (discussing rationale behind fraud on the market theory); *Ross v. Bank South, N.A.,* 885 F.2d 723, 739 (11th Cir.1989) (en banc) (Tjoflat, J., specially concurring) (same), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990). We find it very doubtful that Georgia courts would change their historic requirement of proof of reliance by grafting a rule of federal securities law onto their body of tort law.

The point of this discussion is not to conclusively demonstrate that the Chudasamas have failed to state a claim for relief. Rather, the clear weaknesses in their claim illustrate the severity of the district court's abuse of discretion in not issuing a ruling on Mazda's motion to dismiss.

26

resolve, the court should provide rulings on the objections.[40]  When a party moves the court to compel discovery, the court should consider and rule on the objections filed by the resisting party. While it has discretion to grant or deny the motion, it should not grant the motion in the face of well-developed, bona fide objections without a meaningful explanation of its decision.

Filtering out overly burdensome discovery requests before issuing dispositive orders serves many of the same purposes as eliminating nonmeritorious claims for relief that unnecessarily broaden the scope of discovery.  To the extent that such requests unduly broaden the scope of discovery, rejecting them saves significant costs to the parties, the court, and other litigants.  To the extent the requests unduly increase the parties' costs of compliance, rejecting them will result in more equitable and more efficient discovery management and will discourage further abuse.

Our review of the record in this case convinces us that Mazda filed and argued numerous good-faith objections based on persuasive grounds.  Although we express no opinion as to whether the objections should have been sustained, we are deeply concerned by the district court's failure either to explain why it granted the compel order over Mazda's objections or otherwise to indicate that it had taken the objections into consideration.  As with the court's refusal to rule on the motion to dismiss, we find that this mismanagement by the court strongly suggests that the court abused its discretion in issuing the compel order.  When both instances of the court's mismanagement are viewed together, any doubt that the court abused its discretion in issuing the compel order disappears.  That order must be vacated.

B.

---

[40]If the parties' disputes are complex or would require an inordinate amount of the district court's time to resolve, the court may appoint a magistrate judge to referee the discovery process pursuant to Federal Rule of Civil Procedure 72(a).  The local rules in the Middle District of Georgia have a similar provision.  *See* M.D. Ga. Local Rule 12.2.  While a magistrate judge could not decide dispositive matters, like a motion to dismiss, without the consent of the parties, the judge could issue proposed findings of fact and recommendations to aid the district court in reaching its decision.  *See* 28 U.S.C. § 636(b)(1)(B) (1994);  Fed.R.Civ.P. 72(b);  M.D. Ga. Local R. 12.3.  If the district court does not believe it has the time to resolve discovery disputes, it is free to delegate much of that task to a magistrate judge.

Having determined that the district court abused its discretion in ordering Mazda to respond to the Chudasamas' requests, we turn to the subsequent sanctions order to determine whether it fell within the district court's broad discretion. The answer is fairly clear: the district court would have been hard pressed to fashion sanctions more severe than those included in its order. Mazda lost nearly everything that was at stake in the litigation and more. In addition to granting costs and attorneys' fees to the Chudasamas, the court struck Mazda's answer and ordered that a default be entered on all claims,[41] reserving damages as the only issue to be tried on the merits. Moreover, it vacated its previously entered protective order. This may have been as prejudicial a sanction as it could adopt.[42] Not only could Mazda's commercial competitors gain access to the design documents, marketing materials, and other proprietary information which Mazda had already disclosed, the order made it clear that Mazda had to disclose even more sensitive information to assist the Chudasamas in the looming trial on damages. These sanctions were so unduly severe under the circumstances as to constitute a clear abuse of discretion.

The severity of these sanctions required the court to find that Mazda's "noncompliance" with the compel order was intentional or in bad faith. *See Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958); *Searock v. Stripling,* 736 F.2d 650, 653 (11th Cir.1984). "Violation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default...." *Malautea,* 987 F.2d at 1542. Moreover, a district court abuses its discretion under Rule

---

[41]The court still did not determine whether the fraud claim stated a valid cause of action. Regardless of the willfulness of a party's discovery violation, a default judgment cannot stand on a complaint that fails to state a claim. *See Nishimatsu Constr. Co. v. Houston Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir.1975) ("A default judgment is unassailable on the merits but only so far as it is supported by *well-pleaded* allegations, assumed to be true.") (citing *Thomson v. Wooster,* 114 U.S. 104, 113, 5 S.Ct. 788, 792, 29 L.Ed. 105 (1885)); *Black v. Lane,* 22 F.3d 1395, 1399 (7th Cir.1994); *Whittlesey v. Weyerhauser Co.,* 640 F.2d 739, 742 (5th Cir.1981).

[42]This sanction makes us question an earlier panel's characterization of a default as "the most awesome weapon in the Rule 37 arsenal." *Adolph Coors Co. v. Movement Against Racism & the Klan,* 777 F.2d 1538, 1543 (11th Cir.1985).

37(b)(2) if it enters a default when "less draconian but equally effective sanctions were available." *Adolph Coors Co. v. Movement Against Racism & the Klan,* 777 F.2d 1538, 1543 (11th Cir.1985).

In its sanctions order, the district court found that Mazda acted in bad faith when it failed to comply with the compel order. This finding has little support in the record and is erroneous. The district court's compel order required Mazda to "make complete, proper, non-evasive responses" to a list of the Chudasamas' discovery requests. The order itself and the record in general are completely devoid of any guidance from the court as to how Mazda was to respond. As we have illustrated above, many of these requests were extremely broad, vague, or both. Literal compliance with several of the requests was simply not possible. Thus, Mazda's assumption that literal compliance was not required is at least understandable.

Mazda brought these complications to the court's attention both before and after the compel order was entered. Prior to the entry of the order, Mazda's objections, and especially its November 4, 1994, letter listing three main disputes that required resolution, put the court on notice of the need for clarification of the Chudasamas' requests. *After* the court entered its compel order, it received even clearer notice of Mazda's inability to comply with the Chudasamas' discovery requests; the statements of Mazda's counsel at the April 24, 1995, hearing, Mazda's April 19 memorandum opposing sanctions, and Mazda's May 30 motion for reconsideration or clarification of the compel order all informed the court that literal compliance with the discovery requests—and thus the compel order—was simply not possible. The district court disregarded Mazda's emphatic requests for rulings or clarification and issued a compel order containing no guidance as to how it was to be satisfied. In short, the patent ambiguity in the discovery requests that the court compelled Mazda to satisfy and the court's utter failure to clarify Mazda's obligations were largely to blame for Mazda's "noncompliance." Moreover, less onerous sanctions were available; the vacatur of the

protective order in particular was entirely unnecessary.[43]  Therefore, the severe sanctions order

entered in this case was a clear abuse of discretion and cannot stand under Rule 37(b)(2).

IV.

As noted, the district court also based its sanctions order on Rule 26(g).  This rule requires

that discovery-related filings bear the signature of an attorney of record.  This signature certifies that

the filing conforms to the discovery rules, is made for a proper purpose, and does not impose undue

burdens on the opposing party in light of the circumstances of the case.  Fed.R.Civ.P. 26(g)(2).[44]

If the court finds that "without substantial justification a certification is made in violation of the

rule," then it must impose on the offending party "an appropriate sanction, which may include an

order to pay" the other party's expenses including attorneys' fees.  Fed.R.Civ.P. 26(g)(3).

---

[43]The sanction of vacating a protective order is particularly problematic.  "[A] primary purpose of Rule 37 sanctions is to deter future abuse of discovery."  *Adolph Coors* Co., 777 F.2d at 1542 (citing *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (per curiam)).  The record clearly shows that Mazda relied on the protective order when it provided a large percentage of its discovery responses.

The potential economic harm of allowing Mazda's proprietary information to be disclosed to its commercial competitors may very well exceed its potential liability in this case.  If we were to let the sanctions stand, Mazda, and other large corporations amenable to suit in the Middle District of Georgia, may determine that, from the outset, Mazda would have been better off to disclose *no* proprietary information and accept a default.  Although it would have lost the lawsuit, it would have been assured that its proprietary information would not end up in the public record.  Thus, instead of deterring Mazda and other potential commercial defendants from abusing the discovery process in the future, the district court's sanctions order could have the opposite effect.

[44]Specifically, the signature certifies that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objection is:

(A) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;

(B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;  and

(C) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

Fed.R.Civ.P. 26(g).

30

The decision whether to impose sanctions under Rule 26(g)(3) is not discretionary. Once the court makes the factual determination that a discovery filing was signed in violation of the rule, it must impose "an appropriate sanction." *See Malautea,* 987 F.2d at 1545. The decision of what sanction is appropriate, however, is committed to the district court's discretion. Fed.R.Civ.P. 26(g) advisory committee's note (1983 amend.) ("The nature of the sanction is a matter of judicial discretion to be exercised in light of the particular circumstances."). When reviewing a sanctions order entered pursuant to Rule 26(g)(3), we therefore review the court's factual finding that a certification was made in violation of Rule 26(g) for clear error and the court's decision of the appropriate sanction for an abuse of discretion. *See Malautea,* 987 F.2d at 1545.

The record does contain some evidence that Mazda abused the discovery procedures, withheld admittedly relevant information, and engaged in dilatory tactics. Accordingly, the court's determination that Mazda certified its discovery responses and objections in violation of Rule 26(g) is not clearly erroneous. Contrary to the Chudasamas' assertions, however, this evidence is not enough to support the severe sanctions order. First, the majority of Mazda's misconduct was due to the court's utter failure to exercise its discretion in managing the case. While we do not condone self-help, under the circumstances here, we find the entry of a default and the vacatur of the protective order to be undue punishment.

Second, the imposition of such severe sanctions "is appropriate only as a last resort." *Malautea,* 987 F.2d at 1542. Had the court taken the time to examine Mazda's motion to dismiss or its discovery objections and then issued a meaningful ruling, we believe that Mazda's compliance with the Chudasamas' requests would have been satisfactory.

Finally and most importantly, in exercising its discretion under Rule 26(g)(3) for determining an appropriate sanction, the district court must analyze the needs of the case. *See* Fed.R.Civ.P. 26(g)(2)(C). As our earlier analysis demonstrates, the court clearly failed to do this. It *never* ruled on Mazda's motion to dismiss or offered any indication that it had given the motion serious consideration. The court's failure to rule on the motion to dismiss or to address Mazda's discovery

31

objections demonstrates that it did not analyze the needs of the case. Although sanctions may have been appropriate, the severe sanctions imposed were clearly excessive, and the court's determination of the "appropriate sanction" under Rule 26(g)(2)(C) was therefore an abuse of discretion.[45] Because the sanctions order cannot stand under either Rule 37(b) or Rule 26(g), it must be vacated.

V.

Understandably, Mazda asks us to reassign this case to another district judge on remand. Our authority to grant this relief is well established. *See* 28 U.S.C. § 2106 (1994) (authorizing court of appeals to "remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances"); *United States v. Remillong,* 55 F.3d 572, 577-78 n. 12 (11th Cir.1995) (per curiam).

Three factors inform our decision to reassign a case on remand: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; (3) whether reassignment would entail waste and duplication out of proportion to the gains realized from reassignment." *Id.* at 578 n. 12 (quoting *United States v. Torkington,* 874 F.2d 1441, 1446 (11th Cir.1989) (per curiam)).

---

[45]We note that the imposition of costs and attorneys' fees probably would not have been an abuse of discretion. Rule 26(g)(3) suggests just such a sanction. *See Malautea,* 987 F.2d at 1545. Although this observation may suggest that we should affirm at least that part of the district court's order imposing this sanction and vacate the rest, we cannot do so in this case.

    First, the order requires payment of all costs and fees "associated with th[e] protracted and costly discovery dispute." As the text of the rule suggests, an order imposing costs generally should be limited to "the reasonable expenses incurred *because of the violation.*" Fed.R.Civ.P. 26(g)(3) (emphasis added). Clearly, the unreasonably broad and vague discovery requests propounded by the Chudasamas and their unwillingness to narrow them were as much to blame for the delay and excessive costs that have been incurred in this case as were Mazda's dilatory tactics. Even more to blame, in our view, is the district court itself for failing actively to manage this case.

    Second, as should now be apparent, the district court's management of this case, including the imposition of sanctions, is so infected with abuses of discretion that we must vacate the order *in toto.* It is simply not possible to carve out a portion of the order and affirm it on the ground that it was not an abuse of discretion.

While the strong language employed in both the compel order and the sanctions order suggest that the district judge may have trouble putting aside his previous views, we find the second factor the most telling. The extent of the judge's abuse of discretion—and the partiality of the practices constituting that abuse—would have a significant effect on the appearance of justice should he remain assigned to this case. In particular, the judge's practice of delegating the task of drafting sensitive, dispositive orders to plaintiffs' counsel, and then uncritically adopting the proposed orders nearly verbatim, would belie the appearance of justice to the average observer.[46]

Finally, although significant time has already been spent on this case under his direction, the judge's failure to manage the case removes any concerns involving waste or duplication. Although he had the case for over a year and a half by the time he issued the sanctions order, the record gives no indication that the judge ever spent any time considering the key pretrial issue, the motion to

---

[46]We have consistently frowned upon the practice of delegating the task of drafting important opinions to litigants, and "[t]he cases admonishing trial courts for the verbatim adoption of proposed orders drafted by litigants are legion." *Colony Square Co. v. Prudential Ins. Co.,* 819 F.2d 272, 274-75 (11th Cir.1987). This practice harms the quality of the district court's deliberative process, *see id.* at 275, impedes our ability to review the district court's decisions, *see Keystone Plastics, Inc. v. C & P Plastics, Inc.,* 506 F.2d 960, 962 (5th Cir.1975), and creates "the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor," *Anderson v. City of Bessemer City,* 470 U.S. 564, 572, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985). *See also United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 657 n. 4, 84 S.Ct. 1044, 1047 n. 4, 12 L.Ed.2d 12 (1964) (quoting Judge J. Skelly Wright's admonition that the lawyers who draft opinions "in their zeal and advocacy and their enthusiasm are going to state the case for their side ... as strongly as they possibly can. When these [opinions] get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case.").

We fully recognize that the district court's adoption of the Chudasamas' draft orders nearly verbatim does not affect our standard of review, *see Anderson,* 470 U.S. at 572, 105 S.Ct. at 1510, and does not automatically create an "appearance of impropriety" that would require the district judge to recuse under 28 U.S.C. § 455(a) (1994), *see Colony Square Co.,* 819 F.2d at 276 n. 14. Nonetheless, in light of (1) the extent of the court's abuse of discretion in managing the case, (2) the utter lack of an appearance of impartiality in the text of the proposed orders, (3) the fact that one of the orders imposed sanctions against the opposing party and counsel, (4) the inclusion in the order of the vacatur of the protective order, which was neither requested in the Chudasamas' motion for sanctions nor suggested by the district court when it asked counsel to draft the order, and (5) the frequency with which the district judge employed this procedure in this case, the court's practice of uncritically adopting counsel's proposed orders strongly suggests, if not requires, that this case be reassigned.

33

dismiss the fraud count. Despite the length of time this case has been pending, it is really a simple products liability case. We have confidence that a new judge who properly manages this case will need little time to "get up to speed." The gains to be realized from reassignment will far outweigh the costs.

## VI.

For the foregoing reasons, we VACATE both the district court's order compelling discovery and its order granting the appellee's amended motion for sanctions and REMAND this case with the instruction that the Chief Judge of the Middle District of Georgia reassign the case to a different district judge for further proceedings consistent with this opinion.